2003 WL 22430189
--- F.Supp.2d ---
(Cite as: 2003 WL 22430189 (W.D.Va.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, W.D. Virginia,
Harrisonburg Division.

UNITED STATES of America
v.
Lance PORTER, Defendant.

No. CRIM.A.5:03 CR 00035.

Oct. 24, 2003.

Defendant moved to suppress evidence seized subsequent to officers' warrantless entry into his residence. The District Court, Michael, Senior District Judge, held that: (1) exigent circumstances justified warrantless entry into defendant's home, and (2) exclusion of evidence seized pursuant to warrantless entry was not required.

Motion denied.

[1] Searches and Seizures ⊂⇒25.1

349k25.1 Most Cited Cases

Physical entry of the home is the chief evil against which the protections of the Fourth Amendment apply. U.S.C.A. Const.Amend. 4.

[2] Searches and Seizures ⊂⇒25.1
349k25.1 Most Cited Cases

Warrantless entry into an individual's home is presumptively unreasonable under Fourth Amendment in light of heightened privacy interest therein. U.S.C.A. Const.Amend. 4.

[3] Searches and Seizures ⊂⇒24
349k24 Most Cited Cases

Warrantless entry of a home may be constitutionally permissible if the intrusion falls within one of the carefully defined exceptions to Fourth Amendment warrant requirement. U.S.C.A. Const.Amend. 4.

[4] Searches and Seizures ⊂⇒42.1

349k42.1 Most Cited Cases

Among the recognized exceptions to general warrant requirement under Fourth Amendment is the existence of exigent circumstances, which arise when law enforcement officers confront a compelling necessity for immediate action that would not brook the delay of obtaining a warrant. U.S.C.A. Const.Amend. 4.

[5] Searches and Seizures ⊂⇒42.1
349k42.1 Most Cited Cases

One judicially recognized exigency justifying warrantless entry into a home occurs when the delay in obtaining a warrant poses a threat to the safety of police officers or of the general public; such emergency doctrine permits warrantless entry of a home when the circumstances call for immediate entry incident to the service and protective functions of the police, as opposed to, or as a complement to, their law enforcement functions. U.S.C.A. Const.Amend. 4.

[6] Searches and Seizures ⊂⇒42.1
349k42.1 Most Cited Cases

For emergency doctrine permitting warrantless entry into a home to apply, person making the entry must have had an objectively reasonable belief that an emergency existed which required immediate entry to render assistance or prevent harm to persons or property within, and such a belief must exist as of the moment of the entry, with courts taking into consideration the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers. U.S.C.A. Const.Amend. 4.

[7] Searches and Seizures ⊂⇒42.1
349k42.1 Most Cited Cases

Exigent circumstances justified warrantless entry into defendant's home even though, after officers arrived on scene with sole understanding that home security alarm had been activated, neighbors provided plausible explanation for triggering of alarm that was consistent with officers' general observations of premises, in that officers' determination that further investigation was warranted was entitled to deference, officers'

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22430189
--- F.Supp.2d ---
(Cite as: 2003 WL 22430189 (W.D.Va.))

Page 2

conduct was type of police work that community would expect and possibly demand, and activation of alarm in conjunction with additional information supporting possibility of break-in was sufficient to support determination that exigency existed. U.S.C.A. Const.Amend. 4.

**[8] Searches and Seizures** ⚚42.1
349k42.1 Most Cited Cases

Given the need for police to make complicated judgments in what is frequently a very short period of time, the exigent circumstances doctrine requires courts to give some deference to the decisions of trained law enforcement officers in the field, and thereby to avoid unreasonable second-guessing of the officers' assessment of the circumstances that they faced in deciding whether to conduct warrantless search. U.S.C.A. Const.Amend. 4.

**[9] Searches and Seizures** ⚚42.1
349k42.1 Most Cited Cases

Seizure of evidence following warrantless entry into defendant's home was valid when officers' initial entry was justified by exigent circumstances, officers limited scope of that entry by conducting brief sweep of residence and limiting their search, which had been prompted by activation of home security alarm, to visual observation of each floor of home, contraband of an immediately apparent incriminating nature was observed in plain view during such sweep, and officers relied on their observations to obtain search warrant authorizing subsequent entry during which seizures occurred. U.S.C.A. Const.Amend. 4.

Paul H. Thomson, Winchester, VA, for defendant.

Bruce A. Pagel, United States Attorneys Office, Charlottesville, VA, for United States of America.

MEMORANDUM OPINION

MICHAEL, Senior District J.

*1 Before the court is the defendant's motion to suppress evidence seized subsequent to a warrantless entry of his residence by two Winchester Police Officers responding to the reported activation of the defendant's home security alarm. For the reasons set forth below, the court

finds that the officers' entry into the defendant's home did not violate his Fourth Amendment rights. Accordingly, the court will deny the defendant's motion to suppress.

I.

On April 7, 2002, at 3:47 p.m., the Winchester Police Department dispatcher transmitted a radio call regarding the activation of a home security alarm at 552 Allston Circle, the residence of defendant Lance O. Porter. Officers Brunson and Christensen of the Winchester Police Department received separate radio calls from the police dispatcher and each individually responded to the scene. Officer Brunson was first to arrive, approximately five to ten minutes after the original radio transmission.

The residence at 552 Allston Circle, an end unit townhouse with one front door and one back door, is located in a residential neighborhood. The information provided to the officers in the dispatcher's radio call indicated that the alarm was activated by the rear door to the home. At the time of Officer Brunson's arrival, there was no audible alarm sounding at the home. [FN1] As Officer Brunson approached the front door to begin a survey of the home, a neighbor, later identified as Mr. Barry Sutton, emerged from the adjacent townhouse, 548 Allston Circle. Sutton approached Officer Brunson and explained that a young, female child from the neighborhood possibly activating the alarm. Sutton told the officers that he observed the child open the door from his backyard, during a luncheon cookout in his backyard. Mr. Sutton explained that the child's mother then pulled her away from the door and that he subsequently heard the alarm activate. Sutton's backyard lies immediately adjacent to the defendant's backyard, with the two properties partially separated by a fence line.

After listening to the account of the incident given by Mr. Sutton, Officer Brunson surveyed the front door area of the defendant's townhouse and found no signs of forced entry or other unusual circumstances. He knocked on the front door, but received no response. Officer Brunson then proceeded to the rear door of the house with Officer Christensen who had just arrived at the scene. Upon their arrival at the rear of the house, Ms. Brianna

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Nei, of 544 Allston Circle, emerged from the back of Mr. Sutton's residence at 548 Allston Circle and spoke with Officer Brunson. Nei explained that it was her two-year-old daughter, Ariel, who had accidentally opened the rear door to 552 Allston Circle. Ms. Nei stated that she and her daughter were present at Mr. Sutton's cookout with other neighborhood families. Officer Brunson, however, observed no obvious signs of a party in the neighbor's backyard. Upon surveying the rear entrance to 552, the officers found the back door closed, but unlocked with no signs of forcible entry.

*2 Officer Brunson and Officer Christensen proceeded to enter the residence at 552 Allston Circle through the rear door. Upon their entry, Officer Brunson announced his presence but received no response. The officers then conducted a sweep of the entry level of the home to determine if a crime was in progress or if there was anyone inside in need of assistance. Finding no one, Officer Brunson proceeded upstairs to the first floor of the home, where he observed clear plastic bags containing a green plant substance resembling marijuana on the kitchen table and on a nearby couch. Officer Brunson next ascended the stairs to the second floor of the home and observed substantial quantities of U.S. paper currency on top of a dresser. The sweep of the inside of the home lasted approximately five minutes. After this preliminary sweep, finding no one present inside the home, the officers exited the residence. Officer Christensen remained immediately outside the home to secure the front door. Meanwhile, Officer Brunson contacted his supervising officers, Sergeant Danielson and Lieutenant Griffith, and waited for instructions to follow.

During this time, the defendant arrived at his home accompanied by an unidentified female. Sergeant Danielson arrived at the scene shortly thereafter. Sergeant Danielson asked the defendant to consent to a search of his home, but the defendant declined. Lacking the defendant's consent to conduct a search, Officer Brunson and Sergeant Danielson departed to obtain a warrant to search the defendant's residence. The search warrant was successfully obtained, and Sergeant Danielson and Officer Brunson returned to the defendant's home to execute and to serve the warrant. The search revealed eighteen bags of marijuana (weighing in total approximately one ounce), a handgun, weight

scales, three thousand dollars in U.S. currency, and plastic wrap coated in motor oil or grease.

II.

[1][2] The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. AMEND. IV. While the Fourth Amendment protects the individual's privacy in a variety of settings, nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Indeed, it is widely recognized that physical entry of the home is "the chief evil" against which the protections of the Fourth Amendment apply. United States v. United States Dist. Ct., 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Because of this heightened privacy interest, warrantless entry into an individual's home is presumptively unreasonable. Payton, 445 U.S. at 586.

[3][4] Warrantless entry of a home may be, however, constitutionally permissible if the intrusion falls within one of the carefully defined exceptions to the warrant requirement. United States v. Cephas, 254 F.3d 488, 494 (4th Cir.2001). Among the recognized exceptions to the general warrant requirement is the existence of exigent circumstances. Exigent circumstances arise where "law enforcement officers confront a compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant." United States v. Wiggins, 192 F.Supp.2d 493, 498 (E.D.Va.2002) (quoting United States v. Tibolt, 72 F.3d 965, 969 (1st Cir.1995)). For example, the Fourth Circuit Court of Appeals has held that exigent circumstances justifying warrantless entry exist where "police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant." Cephas, 254 F.3d at 494-95.

*3 [5][6] Yet another judicially recognized exigency justifying warrantless entry occurs when the delay in obtaining a warrant poses a threat to the safety of police officers or of the general public. Wiggins, 192 F.Supp.2d at 501. This "emergency

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22430189
--- F.Supp.2d ---
(Cite as: 2003 WL 22430189 (W.D.Va.))

doctrine" permits warrantless entry of a home when the circumstances call for "immediate entry [ ] incident to the service and protective functions of the police, as opposed to, or as a complement to, their law enforcement functions." *United States v. Moss,* 963 F.2d 673, 678 (4th Cir.1992); *see also Murdock v. Stout,* 54 F.3d 1437, 1441 (9th Cir.1995) (defining exigent circumstances to exist where "necessary to prevent physical harm to [police] officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating law enforcement efforts."). For the emergency doctrine to apply, however, the person making the entry must have had an objectively reasonable belief that "an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *Id.* Such a belief must exist as of the moment of the officers' entry into a home, with courts taking into consideration "[t]he appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Reed,* 935 F.2d 641, 643 (4th Cir.1991).

Because the existence of exigent circumstances depends, in essence, on an evaluation of the reasonableness of the officers' actions, the test evades precise formulation. *See O'Connor v. Ortega,* 480 U.S. 709, 731, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (Scalia, J., concurring). Rather, the presence or absence of emergency circumstances will vary from case to case depending on the inherent necessities presented by the facts of each. *Reed,* 935 F.2d at 642. It is therefore helpful to review cases in which courts faced with similar circumstances have found the existence of an exigency to justify entry of a home.

Police generally have been found to be justified in entering a home in response to a reported burglary or home security alarm, even absent a warrant, so long as the totality of the facts and circumstances support the likelihood that a burglary may be in progress. For example, in *Reardon v. Wroan,* 811 F.2d 1025 (7th Cir.1987), police were called to investigate a reported burglary in progress. The police knew that the address given belonged to a fraternity house, that the local university students were on a holiday break, and that burglaries

occurred more frequently during that time of year. Upon arrival, the police found the back door unlocked and observed that the house was completely dark. The Seventh Circuit Court of Appeals determined that these circumstances were sufficient to justify the officer's entry under the exigent circumstances doctrine. *Id.* at 1030. Other courts addressing the validity of a warrantless search under similar conditions have reached the same result. *See Bilida v. McCleod,* 211 F.3d 166 (1st Cir.2000) (officer's entry into fenced backyard in response to silent security alarm supported reasonable perception of imminent threat sufficient to justify warrantless entry); *United States v. Tibolt,* 72 F.3d 965, 970-71 (1st Cir.1995) (officers responding to a security alarm who inadvertently entered wrong home nonetheless justified in doing so; security alarm, along with unlocked rear door, supported officers' reasonable suspicion of a possible break-in justifying entry); *Murdock v. Stout,* 54 F.3d 1437 (9th Cir.1995) (officers' observation of open patio door and failure to elicit a response from resident when circumstances suggested that a resident should have been present supported finding of exigent circumstances); *United States v. Johnson,* 9 F.3d 506 (6th Cir.1994) (officer's observation of broken window while responding to burglary report was exigent circumstance justifying warrantless entry); *United States v. Dighera,* 2 F.Supp.2d 1377 (D.Kan.1998) (officer responding to security alarm with no response within residence presented exigent circumstances permitting immediate warrantless entry).

**\*4 [7]** Here, the officers arrived on the scene with the sole understanding that a home security alarm had been activated. These officers had been trained, and properly so, to investigate the alarm and to determine whether any additional signs suggesting a break-in, including an open window or unlocked door, could be observed. The cases noted above suggest that, were these the exclusive circumstances confronting the officers at the time of their arrival, entry following an announcement would be justified under the exigency doctrine. This case, however, presents a somewhat more nuanced set of circumstances in that the officers were confronted with a plausible explanation for the activation of the home security alarm. The court recognizes that, in retrospect, the explanation provided by both Mr. Sutton and Ms. Nei for the triggering of the alarm was perfectly reasonable and consistent with the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22430189
--- F.Supp.2d ---
(Cite as: 2003 WL 22430189 (W.D.Va.))

Page 5

officers' general observations. Nonetheless, the court is not persuaded that the limited information provided by the defendant's neighbors lead to the conclusion that the officers acted unreasonably in entering the defendant's home without a warrant.

[8] First, given the need for police to make complicated judgements in what is frequently a very short period of time, the exigent circumstances doctrine requires courts to give some deference to the decisions of trained law enforcement officers in the field and thereby to avoid " 'unreasonable second- guessing' of the officers' assessment of the circumstances that they faced." *Figg v. Schroder,* 312 F.3d 625, 639 (4th Cir.2002) (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)). The officers' determination that, despite the explanation provided by the defendant's neighbors, there nonetheless might be reason to investigate further is one such judgment worthy of deference.

Second, there can be no doubt that the conduct of the officers in this instance was exactly the type of police work the community would expect, and possibly even demand. *But see Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (community's approval of anti-gang ordinance did not cure its constitutional invalidity). Indeed, the very presence of a security system in the defendant's home suggests the police would be in dereliction of their duties had they not decided to investigate absent the presence of a resident. *See Murdock v. Stout,* 54 F.3d 1437, 1442 (9th Cir.1995) ("[W]e are convinced that citizens in the community would have understandably viewed the officers' actions as poor police work if they had left the scene or failed to investigate further at once."). In this case, it is easy to imagine the likely community outrage had the police failed to investigate and had there actually been someone in need of immediate assistance inside the home.

Finally, the activation of an alarm in conjunction with additional information supporting the possibility of a break-in is sufficient to support police officers' determination that an exigency exists. The very purpose for a home security alarm is to signal that something may be amiss. In the face of an alarm, officers may reasonably conclude that a burglary may be in progress and may conclude, as here, that a neighbor's explanation to the contrary is not entirely credible. While this court by no means suggests that the police have license to enter a private residence every time an alarm is activated, they do have a duty to investigate, and, when the facts and circumstances suggest reasonable suspicion that an exigency exists, to enter the home. In the face of such circumstances, "[i]t would defy reason to suppose that [law enforcement officers] had to secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested." *United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982).

*5 In short, although the court recognizes the importance of preserving privacy of the home under established Fourth Amendment principles, it also acknowledges that there are circumstances in which law enforcement officers must be permitted to enter a home absent a warrant. The exigency exception to the warrant requirement recognizes several such circumstances, including the need to permit officers to respond where police or public safety is reasonably believed to be implicated. This court is of the view that the circumstances confronting Officers Brunson and Christensen present this type of exigency, and therefore their warrantless entry of the defendant's home was justified.

III.

[9] There is little dispute that, no violation of the Fourth Amendment having been found in the officers' initial entry, no further basis for exclusion of the evidence in question exists. The officers limited the scope of their initial entry to the justification for doing so. *See Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The officers conducted a brief sweep of the residence, limiting their search to a visual observation of each floor of the home. Their search was restricted in scope to that necessary to determine whether a crime was in progress or a resident was in need of assistance. During the course of the sweep, and without exceeding the scope of the justification for the search, the officers observed contraband, the incriminating nature of which was apparent, in "plain view" in several locations around the home. While in the residence, the officers did not touch, pick up, or seize any of the items observed, despite the fact that they would have been justified in doing so. *See Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22430189
--- F.Supp.2d ---
(Cite as: 2003 WL 22430189 (W.D.Va.))

L.Ed.2d 112 (1990). Rather, they took the more cautious approach, relying on their observations to support their application for a search warrant. Having obtained a warrant, there is no doubt the officers' subsequent entry passes Fourth Amendment muster. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

### IV.

For the foregoing reasons, the court finds that exigent circumstances existed at the time the officers' entered the defendant's home, thereby justifying their entry without a warrant. Accordingly, the defendant's motion to suppress shall be denied. An appropriate order shall this day issue.

The Clerk of the Court hereby is directed to send a certified copy of this memorandum opinion to all counsel of record.

### ORDER

Before the court is the defendant's Motion to Suppress Statements and Tangible Evidence, filed August 6, 2003. For the reasons set forth in the accompanying Memorandum Opinion, it is this day

ADJUDGED, ORDERED, AND DECREED as follows:

1. The defendant's Motion to Suppress Statements and Tangible Evidence, filed August 6, 2003, shall be, and it hereby is, DENIED.

2. The Clerk of the Court shall be, and hereby is, directed to set this matter for trial.

*6 The Clerk of the Court hereby is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record.

> FN1. The testimony offered by Mr. Barry Sutton indicates that the alarm was audible at the time of Officer Brunson's arrival. The weight of the evidence, however, supports the court's finding that neither of

the police officers heard an audible alarm at any time.

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Page 1 of 2

# East Haven Police Department

## CASE/INCIDENT REPORT

SUPPLEMENTARY

CFS NO. 0100015462

| INCIDENT DATE | DAY | TIME | DATE OF RPT | TIME OF RPT | TYPE OF INCIDENT | | | INCIDENT CD | INVESTIGATING OFFICER | | BADGE NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/27/2001 | 5 | 19:29 | 09/27/2001 | 19:29 | CIVIL MATTER | | | 8301 | Officer Mccarthy, Kevin | | 1080 |

| DIVISION | DIVISION NO. | REFERENCE DIVISION | REFERENCE DIVISION NO. | CASE X-REFERENCE | UNIT ID | TYP/IST | DATE TYPED | TIME TYPED |
|---|---|---|---|---|---|---|---|---|
| Patrol | | | | | 38 | 1080 | 09/27/2001 | 23:06 |

| STREET NO. | STREET NAME AND TYPE | APARTMENT NO / LOCATION | INTERSECTING STREET NAME AND TYPE | STATUS | TOWN CD |
|---|---|---|---|---|---|
| 00713 | FOXON RD  EAST HAVEN | | | | 044 |

| OFFENSE | | LOCAL X-REF CODE | IBR CODE | ATT/COMP | LOCATION | |
|---|---|---|---|---|---|---|
| Civil problem | | 8301 | INF | Completed | Department/Discount Store | |

STATUS CODE  C=COMPLAINANT  V=VICTIM  A=ARRESTEE  J=JUVENILE  H=OTHER  M=MISSING  W=WITNESS  O=OFFENDER  D=DRIVER  S=SUSPECT  P=POLICE OFFICER  T=TOT

| STATUS | NAME | SEX | RACE | D.O.B. | TELEPHONE | ADDRESS | OP STATE & NO. | SOC. SEC. NO. |
|---|---|---|---|---|---|---|---|---|
| C | Ames Department Store | | | | (203) 467 - 2360 | 713 Foxon Road East Haven CT | | |
| C | Carpentino, Linda | F | W | 08/19/1960 | (203) 467 - 2360 | 1192 North High St East Haven CT | CT | - - |
| H | HALIBURDA, ANGELA | F | W | 09/11/1967 | (203) 468 - 9319 | 203 GOLF DR East Haven CT | CT | - - |
| P | DACOSTA, LT. | | | | | DESK SUPERVISOR PD 044 East Haven CT | CT | - - |
| H | CHRISTMAS, RON | | | | (800) 347 - 2663 | | | - - |
| H | DISCOVER CARD | | | | | | | - - |

1=NONE  2=BURNED  3=COUNTERFEIT/FORGED  4=DAMAGED/DEST  5=RECOVERED  6=SEIZED  7=STOLEN  8=UNKNOWN  E=EVIDENCE  A=ABANDONED  I=TOWED  E=IMPOUNDED/FOUND

| CODE | QTY. | DESCRIPTION | BRAND | MODEL | YEAR | STATE | REG | MAKE | MODEL | COLOR | MIN/SERIAL NO. | EST VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 1 | 6011005400251891 | | | | | | | | | | |

On the above date and time this Officer was dispatched to Ames Department Store regarding a possible illegal use of a credit card.

Upon my arrival I spoke with Manager Mrs. Carpentino who stated that one of the cashiers had alerted her that a customer had attempted to use a credit card and that the computer is telling her to call the credit card in. Mrs. Carpention called the phone number on the credit card and the credit card company told her that the credit card was reported stolen.

I then spoke with the customer who was identified as Angela Haliburda who had photo identification and she stated that she can not understand why the credit card in her name is reported as stolen.

| OFFICER SIGNATURE | SUBSCRIBED & SWORN BEFORE ME: NOTARY |
|---|---|
| | THIS _____ DAY OF _____ YR. _____ |

| SUPERVISOR SIGNATURE | |
|---|---|

Report #: 0100015462 - 00001781 Cont.

# East Haven Police Department

Page 2 of 2

## CASE/INCIDENT REPORT

SUPPLEMENTARY

| CFS NO. | INCIDENT DATE | DAY | TIME | DATE OF RPT | TIME OF RPT | TYPE OF INCIDENT | | INCIDENT CD | INVESTIGATING OFFICER | | BADGE NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0100015462 | 09/27/2001 | 5 | 19:29 | 09/27/2001 | 19:29 | CIVIL MATTER | | 8301 | Officer McCarthy, Kevin | | 1080 |
| DIVISION | | DIVISION NO. | | REFERENCE DIVISION | | REFERENCE DIVISION NO. | CASE X-REFERENCE | UNIT ID | TYPIST | DATE TYPED | TIME TYPED |
| Patrol | | | | | | | | 38 | 1080 | 09/27/2001 | 23:06 |
| STREET NO. | STREET NAME AND TYPE | | | | APARTMENT NO / LOCATION | | | | STATUS | | TOWN CD |
| 00713 | FOXON RD  EAST HAVEN | | | | | | | | | | 044 |
| | | | | | INTERSECTING STREET NAME AND TYPE | | | | | | |

, I contacted Discover Credit Card and spoke with Ron Christmas in the security department and he advised me that the credit card was cancelled by the primary credit card holder today (09/27/2001) as a lost or stolen credit card.  Mrs. Haliburda was notified and she stated that she would talk to her husband.

, This Officer took custody of the credit card and will tag it as evidence and Mr. Christmas was notified of the action taken by this Officer.

, Seizure with out a warrant form was completed

| OFFICER SIGNATURE | SUBSCRIBED &SWORN BEFORE ME: NOTARY |
|---|---|
| | THIS _____ DAY OF _____ YR._____ |

SUPERVISOR SIGNATURE

# INVENTORY OF PROPERTY SEIZED
## WITHOUT A SEARCH WARRANT

JD-CR-18 Rev. 9-98
C.G.S. §§ 21a-262, 26-85, 26-90, 54-36a, 54-36g, 54-36h, 46-142(a)

| | |
|---|---|
| [X] | FOR P.D. USE ONLY |
| [ ] | WARRANT APPLIED FOR |
| [ ] | TO COURT |

POLICE CASE/RECEIPT NO. 01-15462

| | | |
|---|---|---|
| | [ ] | Destroy – No Value |
| | [ ] | Case Pending |
| | [ ] | Return to Owner |
| | [ ] | Prisoner's |
| | [ ] | Juvenile |

### PART A
COURT DOCKET NO.

### PART B
COURT DOCKET NO.
CR

### JUVENILE
COURT DOCKET NO.

### INSTRUCTIONS
1. Do not use this form if a search warrant is used.
2. Original must be filed with the Clerk of Court.
3. In the case of an arrest or referral, file with a uniform arrest report or Juvenile Summons/Complaint.
4. Last copy for Police Department use.

TO THE SUPERIOR COURT AT (Address of court)
[ ] JUVENILE MATTERS  [X] G.A. No. __8__  121 Elm Street 3rd floor New HAven

UNIFORM ARREST REPORT/JUV. SUMMONS NO.

COURT APPEARANCE DATE

ARREST/REFERRAL
[ ] MADE  [ ] PENDING

POLICE CASE/RECEIPT NO.
01-15462

COMPANION CASE NO.

NAME, ADDRESS AND TEL. NO. OF DEFENDANT(S)/SUBJECT(S)

1. ..........................................
2. ..........................................
3. ..........................................

NAME, ADDRESS AND TEL. NO. OF COMPLAINANT(S)/OWNER(S)

Ames Department Store 713 Foxon rd
East Haven, CT

2. ..........................................
3. ..........................................

TYPE OF INCIDENT
Civil Matter

| TOWN OF SEIZURE | DATE OF SEIZURE | TYPE OF PROPERTY |
|---|---|---|
| East Haven | 09/27/2001 | [ ] STOLEN  [X] EVIDENCE  [ ] LOST/FOUND  [ ] INVESTIGATION |

The following property was seized, in connection with a criminal/delinquency case: (Describe type, color, serial number, etc.)

**PROPERTY SEIZED**

| | |
|---|---|
| 1. | Item #1. (1) One discover credit card card number 6011005400251891 |
| 2. | END. |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | |
| 12. | |

PART A INVENTORY NO.

PART B INVENTORY NO.

If cash money was seized, enter total amount here ▶

TOTAL AMOUNT OF CASH
$000000000000000

SIGNED (Police Officer)

(Title)

DATE
09/27/2001

DEPARTMENT
East Haven

JUVENILE INVENTORY NO.

## PROPERTY ROOM USE ONLY

EVIDENCE PHOTOGRAPHED
[ ] NO  [ ] YES

DATE

REMARKS

| DATE OUT | REASON | BY | DATE RETURNED |
|---|---|---|---|
| | | | |
| | | | |

(over)

**INVENTORY OF PROPERTY SEIZED**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

LINDA CARPENTINO     :  CIVIL NO. 3:01 CV01663(JBA)
    Plaintiff     :

VS           :

MICHAEL D'AMATO and
GARY DePALMA and
CITY OF EAST HAVEN    :
    Defendants    :  DECEMBER 17, 2002

    Deposition of Mrs. Linda Carpentino, taken pursuant to Rules 26, 30 and 45 of the Federal Rules of Civil Procedure and Local Rule 13(b), at the offices of Lynch, Traub, Keefe & Errante, 52 Trumbull Street, New Haven, Connecticut, before Mr. Robert Geci, a Registered Professional Court Reporter and Notary Public in and for the State of Connecticut, at 10:00 a.m on Tuesday, December 17, 2002.

APPEARANCES:

REPRESENTING THE PLAINTIFF:    WILLIAMS & PATTIS
        By John R. Pattis, Esq.
        51 Elm Street
        New Haven, Ct.   06510

REPRESENTING THE DEFENDANTS:   LYNCH, TRAUB, KEEFE & ERRANTE
        By Marisa Bellair, Esq.
        52 Trumbull Street
        P.O. Box 1612
        New Haven, Ct.   06506-1612

# STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between counsel representing the parties that each party reserves the right to make specific objections at the trial of the case to each and every question asked and of the answers given thereto by the deponent, reserving the right to move to strike out where applicable, except as to such objections as are directed to the form of the question.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the respective parties that proof of the official authority of the Notary Public before whom this deposition is taken is waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the parties that all defects, if any, as to the notice of the taking of the deposition are waived.

Filing of the Notice of Deposition with the original transcript is waived.

calling me.

Q    Okay. You said you went right home and it took you a short time to get there. What did you do once you got home?

A    When I pulled in the driveway there was a small red car with a girl in it. I had to kind of go around her. She was half in my driveway and our easement road. Apparently originally that is why the officers were called there, from this girl, I guess, and I asked her what she was doing there. She started getting a little bit like, you know, panicky or whatnot. I just walked by her and went to the house because I seen my girls at the doorway.

Q    Once you got to the house did you actually speak to the officers yourself?

A    Yes.

Q    Did they identify themselves to you?

A    Yes, they did.

Q    Then what happened next? Can you explain that for me.

A    Officer D'Amato, he was writing little notes on a small pad over a dart board that was on a pole in our private easement road, and said that it had gone flying off. He had gotten waved down from this young girl as he was driving down North High Street. That it came flying off the pole and almost hit her car and that is what made him come down the road, to see if somebody threw it.

Q    He was writing down notes because he discovered a dart board on your pole?

A    He had a dart board in his hand. It was in his trunk, excuse me, and he went to show me that it was in his trunk. It was

on a pole on our private easement road, and the only way I can describe it, it is a very steep hill, it goes down to the main road of North High Street.

Q    You recognized that dart board?

A    It has been there for a long time.

Q    Was that your dart board?

A    Our neighbor's that used to live there before the people that were there at that time.

Q    Did your children ever have occasion to use that?

A    No. It was the man next door actually that used to live there.

Q    You said Officer D'Amato when you discovered him, he was writing notes on a pad. He was physically inside your house?

A    He was right at the foyer entrance of the house, and actually when I first got there they were writing notes, but they asked me if they could go check downstairs, and I said, for what, and they said that we were looking for somebody that may have thrown the dart board and ran up here. I said, sure, because I said, go help yourself. Officer DePalma said that there was a room downstairs that was locked that they couldn't check. I said, I have a spare key, that is my niece Jennifer's room and she is away at college; I can always unlock it for you. By the time I got downstairs they were in the garage going through and came upstairs and they said there is nothing here. Officer DePalma exited and Officer D'Amato stayed near the front stairs of our entrance of the door to get some information.

Q    Was it communicated to you at any time by either of the

14

officers that the reason that they were actually searching inside of your home was because they suspected that there might have been a possible burglary?

A    The only thing they said at the very end was that, we came into your home because your back door was slightly opened; we thought somebody entered it.

Q    Your back door, is that just a door?

A    Slider door.

Q    Just for the record, referring to a regular door like this. I'm sorry, it is a sliding glass door?

A    Yes.

Q    He said they found this slightly open?

A    Yes.

Q    Now, you said they did some more searching, and what happened after that?

A    They just came upstairs from downstairs, said that they seen nothing there.  Told me briefly why they were there.  It had to do a lot with this girl that waved them down from North High Street.  I don't know her name.  I have never seen her before. The dart board never hit her car.  I did look at it.  Apparently she said she was frantic because of the dart board came flying down.

Q    Now, you said that you realized that the dart board never hit her car.  Did you actually go out and make an inspection of her car?

A    Yes, I did.

Q    Did you speak to her at any time or at length about anything?

16

with them.  They left it on the counter, so what I did was left the back slider door unlocked and asked my neighbor to keep an eye on them because they forgot their key, and let them know. When I came home all doors were open and unlocked.

Q    When you say you left the back slider door open, you just left it--

A    Unlocked.

Q    Okay, unlocked.

A    The only reason I know that for sure is because I put my dogs out in the kennel before I left so I knew I had shut it and left it unlocked.

Q    You also claim as part of this lawsuit that there was substantial damage caused to the interior of your house by the actions of Officers D'Amato and DePalma.  Can you explain to me a little about the damage that was done.

Q    My son Marty's room, he had a thirteen inch tv in there.  It was taken and thrown through the wall.  His futon in his room was flipped upside down.  He had a stereo with different boxes of tapes or cassettes, et cetera.  It was tossed on the floor.  He had a box of cassette tapes near his stereo system. It looked like they were looking for something, and it was just like tossed through to check everything out.

Q    Any of this damage, was it ever repaired?

A    Yes.

Q    Do you have a bill showing that the repair work was actually paid for?

A    My husband repaired it.

upset over it, and he met up with a kid that gave him drugs and he had slightly OD'D and went to the hospital.

Q    Do you know when that happened?

A    She passed away in April.  Closer to the end, and it only happened a few days before she did.

Q    And this was in what year?

A    The same year.

Q    April of two thousand, okay.  Now did he ever have any run-ins with the East Haven Police Department as a result of that particular incident?

A    No.

Q    Now we talked a little bit earlier about the dart board and you said it was not yours, it was your old neighbor's.

A    Correct.

Q    Do you know what the neighbor's name was?

A    Their last name was Waldron.

Q    Your children never had occasion to use that?

A    No, no.  It was pretty much his.

Q    How many houses are actually physically situated on your street, High Street?

A    I would say four.

Q    Okay.

A    One is situated on a corner that it could be considered five, but it is pretty much four.

Q    Now your neighbor's names at the time of this incident, do you recall them?

A    McDalia (phonetic spelling) Cruz.

Q    Have you treated with any doctors as a result of this incident?

A    No, I did not.

Q    Have any of your children or your nieces?

A    No, they did not.

Q    Now as part of this claim you are also claiming severe emotional distress.  Can you describe for me the symptoms that you experienced.

A    I will not leave my house unless I check all doors and windows.  If my children are going to be home I make sure they call me as soon as they get there, or if they leave they are to call me and I remind them to lock everything.

Q    Anything else?

A    I just, I have a fear of not trusting anybody.  If I am home and I hear a car go by I will go to the window to see who it is.

Q    Now prior to this incident would it be fair to say that you would check on your children periodically?

A    Periodically, but not as, this is going to sound mean, as neurotic as I am now.  It is a very quiet, private road with nobody there.

Q    Now, prior to this incident did you have some sort of system with them that once they arrived home that you would either call them to make sure that they were there, or they would call you?

A    They would call me as soon as they get there.

Q    Was that procedure in place prior to the incident?

p.

1

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF CONNECTICUT                COPY

3

4  3:01cv01663 (JBA)

5  APRIL 24, 2003

6  -------------------------------------

7  LINDA CARPENTINO,

8                            Plaintiff

9                -vs-

10 MICHAEL D'AMATO and GARY DePALMA,

11                            Defendant

12 -------------------------------------

13

14            DEPOSITION OF MARTIN CARPENTINO

15

16 APPEARANCES:

17        WILLIAMS and PATTIS
            Attorneys for the Plaintiff
18          51 Elm Street
            New Haven, Connecticut  06510
19          (203) 562-9931
         BY:   DAWNE WESTBROOK, ATTORNEY-AT-LAW
20
         LYNCH, TRAUB, KEEFE & ERRANTE
21          Attorneys for the Defendant
            52 Trumbull Street
22          New Haven, Connecticut  06510
            (203) 787-0275
23       BY:   MARISA A. BELLAIR, ATTORNEY-AT-LAW

24

25

1       Deposition of MARTIN CARPENTINO, a deponent in the

2  hereinbefore-entitled action, taken by the defendant,

3  Marisa A. Bellair, Attorney-at-Law pursuant to Notice before

4  Jean Kindley, a duly qualified Notary Public in and for the

5  State of Connecticut, held at the law offices of Lynch,

6  Traub, Keefe & Errante, 52 Trumbull Street, New Haven,

7  Connecticut, on April 24, 2003 at 2:00 p.m.

8              S T I P U L A T I O N S

9     It is hereby stipulated and agreed by and between

10  counsel for the respective parties that all formalities

11  in connection with taking of this deposition, including

12  time, place, sufficiency of and the authority of the

13  officer before whom it is being taken may be and are

14  hereby waived;

15     It is further stipulated and agreed that objections

16  other than as to form are reserved to the time of trial.

17     It is further stipulated and agreed that a Notary

18  Public may notarize said deposition;

19     It is further stipulated and agreed that the

20  deposition is to be filed with the United States District

21  Court upon request.

22

23

24

25

1       A       So, I mean, I don't lock the doors, maybe the

2    front door, but not the back door, who goes in the backyard,

3    it's common area.

4       Q       When you say "the back door," you are referring

5    to the back?

6       A       The slider door.  All the doors are always

7    closed.

8       Q       Have you ever had, to your knowledge, were there

9    ever any problems with the back door closing, meaning

10   shutting all the way?

11      A       Yes.

12      Q       There were problems?

13      A       Yes.

14      Q       What kind of problems?

15      A       We had to replace the door and kind of get the

16   exact one for that model slider we had.

17      Q       Okay.

18      A       Sometimes if you close it, it might come back

19   open a slight bit.  But I don't know what you are really

20   looking for with that question.

21      Q       Exactly.  You answered it fine.

22              Now, when exactly were these problems with the

23   door, if you could just --

24      A       I don't know the exact time.

25      Q       Okay.  Do you recall when the door was actually

1    replaced?

2        A      No.

3        Q      No.  Do you know if it was before or after this

4    incident?

5        A      I believe it was before, but I'm not sure.

6        Q      Okay.

7        A      Even with the first one, it was always damaged,

8    so it would do the same thing.  I'm not sure if it was the

9    track underneath the damage or not, but it always had that

10   little problem.

11       Q      Okay.  So, correct me if I'm wrong, even after

12   the door was replaced, there still was some problems with it

13   closing?

14       A      I believe, like, by now they are probably fixed,

15   I didn't handle that.

16       Q      But you are not sure?

17       A      I don't know.

18       Q      Okay.  Now, have you ever been used by the East

19   Haven Police Department as an informant?

20       A      Yes.

21       Q      Okay.

22       A      But I don't see what that has to do with

23   anything.

24       Q      Well, it's actually relevant in terms of your

25   relationship with the East Haven Police Department.

1

2  STATE OF CONNECTICUT

3                    ss:  NEW HAVEN

4  COUNTY OF NEW HAVEN

5            C E R T I F I C A T I O N

6          I, JEAN KINDLEY, a Notary Public in and

7  for the State of Connecticut, duly commissioned and

8  qualified and authorized to administer oaths, do hereby

9  certify that I was attended at the law office of Lynch,

10  Traub, Keefe & Errante, 52 Trumbull Street, New Haven,

11  Connecticut, on April 24, 2003, starting at 2:00 p.m., by

12  counsel for the respective parties as appears in the

13  herein-entitled cause and the deponent named in the

14  foregoing deposition, to wit: MARTIN CARPENTINO; that said

15  deponent was by me duly sworn and thereupon testified as

16  appears in the foregoing deposition; that said deposition

17  was taken stenographically by me in the presence of counsel

18  for the respective parties and reduced to typewriting under

19  my direction; that the foregoing is a true and correct

20  transcript of the testimony.

21          I also certify that I am neither of counsel

22  nor attorney to either of the parties to said suit, nor am I

23  an employee of either party to said suit, or of either

24  counsel in said suit, nor am I interested in the outcome of

25  said cause.

44

1          Witness my hand and Seal as such Notary Public

2    at New Haven, Connecticut this 2nd day of May, 2002.

3

4    _____          NOTARY PUBLIC

5

6    My Commission Expires:

7    November 30, 2007

8    CSR NO.   003

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25