

FILED

Dec 29  1 on III 03

U.S. DISTRICT COURT
NEW HAVEN CONN.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

LINDA CARPENTINO      :
            :
VS.          :   NO. 3:01CV1663(JGM)
            :
MICHAEL D'AMATO and     :
GARY DEPALMA       :   DECEMBER 29, 2003

**PLAINTIFF'S RULE 56 (a)(2)  STATEMENT OF
MATERIAL FACTS IN DISPUTE**

A. <u>RESPONSE TO DEFENDANTS' RULE 56 STATEMENT</u>

  1.  Agree.

  2.  Agree.

  3.  Agree.

  4.  Agree.

  5.  Agree.

  6.  Agree.

  7.  Agree.

  8.  Disagree. (Pl. Deposition transcript, p. 30 is not provided, and
     Defendant's Case/Incident report is not provided [a 9/27/00
     case/incident report which is not relevant is attached as Def. Ex. 2])

B.    MATERIAL FACTS IN DISPUTE

    1.    There was no reason for the police to enter and search the plaintiff's house without the permission of an authorized occupant. (Def. Ex. 3, p. 14, Ex. A, Ex. B)

    2.    There was no danger to an individual which would justify police entry into a residence without the permission of an authorized occupant. (Ex. A, Ex. B)

THE PLAINTIFF

KATRENA ENGSTROM (ct09444)
WILLIAMS AND PATTIS, LLC
51 Elm Street
New Haven, CT 06510
203/562-9931
FAX:  203/776-9494

CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Hugh Keefe, Esq.,  P. O. Box 1612, New Haven, CT 06506.

KATRENA ENGSTROM

## CASE/INCIDENT REPORT

**SUPPLEMENTARY**

| COMPLAINT NO | INCIDENT DATE/DAY | | TIME |
|---|---|---|---|
| 000013118 | 09/07/2000 | 5 | 13:25 |

| DATE OF REPORT | TIME OF REPORT |
|---|---|
| 09/07/2000 | 14:47 |

| TYPE OF INCIDENT | INCIDENT CODE | INVESTIGATING OFFICER | | BADGE NO | DIVISION | UNIT ID |
|---|---|---|---|---|---|---|
| DAMAGE TO MOTOR VEHICLE | 2907 | Officer | Damato, Michael | 0430 | Patrol | 44 |

STREET NAME AND NO: NORTH HIGH ST   East Haven

| APARTMENT NO / TOWN LOCATION | CODE | INTERSECTING STREET NAME AND TYPE | | TYPIST | DATE TYPED | TIME TYPED |
|---|---|---|---|---|---|---|
| | 044 | | | 0430 | 09/07/2000 | 14 47 |

Offense

Damage Property-Private

| | | Local X-Ref Code | IBR Code | ATI/Comp | Location |
|---|---|---|---|---|---|
| | | 2902 | 290 | Completed | Highway/Road/Alley |

Status Code C=Complainant V=Victim A=Arrestee J=Juvenile B=Other M=Missing W=Witness O=Offender D=Driver S=Suspect P=Police Officer T=TOT

| Status | Name | Sex | Race | Date Of Birth | Address | | | | Operator State & No | Social Security No |
|---|---|---|---|---|---|---|---|---|---|---|
| C | Carpentino, Linda | F | W | 08/19/1960 | (203) 467 - 2360 | 1192 North High St East Haven CT | | | | |
| C | O'BRIEN, HEATHER | F | W | 02/05/1972 | (203) 467 - 7648 | 525c Woodward ave NEW HAVEN CT | | | CT | |
| H | LUIS DELEON | | | | | 1190 N. HIGH ST East Haven CT | | | | |

1 Phone 2 =Burned 3 = Counterfeited/Forged 4 = Damaged/Destroyed 5 = Recovered 6 = Unknown 7 = Stolen = 8 = Seized 9 = Impounded/Found E = Towed F = Evidence A = Abandoned

| Code | Qty. | Description | Brand | Model | Year | State | Registration | Make | Model | Color | Vin/Serial No | Est.Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | | AUTOMOBILE | | | 2001 | CT | 838JMH | Toyota | Corola | Red | | $200.00 |

| | Total: | Stolen: | Recovered | Total Loss |
|---|---|---|---|---|
| | | $.00 | $.00 | $.00 |

| Year | State | Registration | Make | Model | Color | Vin/Serial No | Insurance Company | Policy Number |
|---|---|---|---|---|---|---|---|---|
| 2001 | CT | 838JMH | Toyota | Corola | Red | | | |

While driving South on North High st., I was alerted by a white female that was pulled over. I stopped to assist and was told that while she was driving South she was struck by an object which flew from the woods on the West side of North High st. The object hit her 2001 Toyota in the front bumper area, leaving scuff marks. Upon checking, she discovered the object was a cork dart board. The area she stated it came from is a private road elevated high and overlooks North High. There are four homes on this private road. This officer told it driver, Heather O'Brien to follow me up the driveway which she did. Once there I was met by a male who identified himself as Luis Deleon who came out of 1190 North High. I asked him if he was just outside and he stated no. I told him that someone just threw a dart board down into the path of a vehicle and it came from the front area of his home. Deleon stated he was inside with his baby daughter and saw nothing. There was a second female there who refused to give me her name. I told both parties to stay put while I check the hoist next door because they were suspects. both became upset and stated they knew nothing. I then checked at 1192 North High and found a rear slider open about four inches. believing there might be someone within that did not belong I announced myself and went in. Officer Depalma arrived and we checked the home finding no-one within. Homeowner L.Carpentino arrived and confirmed the home was empty. I asked Carpentino if any other kids live on the road, she stated no, only next door at 1190 where Deleon was. I went back and

| Supervisor Signature | Officer Signature | Subscribed &Sworn Before Me: Notary |
|---|---|---|
| | | This_____ Day Of _____ Yr._____ |

East Haven Police Department

## CASE/INCIDENT REPORT

SUPPLEMENTARY

| COMPLAINT NO. | INCIDENT DATE/DAY | | TIME | DATE OF REPORT | TIME OF REPORT | TYPE OF INCIDENT | INCIDENT CODE | INVESTIGATING OFFICER | BADGE NO | DIVISION | UNIT ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 000013118 | 09/07/2000 | 5 | 13:25 | 09/07/2000 | 14:47 | DAMAGE TO MOTOR VEHICLE | 2907 | Officer Damato, Michael | 0430 | Patrol | 44 |

| STREET NO. | STREET NAME AND TYPE | APARTMENT NO / LOCATION | TOWN CODE | INTERSECTING STREET NAME AND TYPE | CASE X-REFERENCE | TYFIRST | DATE TYPED | TIME TYPED |
|---|---|---|---|---|---|---|---|---|
| 1192 | NORTH HIGH ST   East Haven | | 044 | | | 0430 | 09/07/2000 | 14:47 |

spoke to Deleon and explained that there was no-one else home on the road and that he and his female friend are my only suspects.
Due to my not having enough probable cause, an arrest was not made.

| Supervisor Signature | Officer Signature | Subscribed & Sworn Before Me: Notary |
|---|---|---|
| | _(signature)_ | This ____ Day Of ____ Yr. ____ |

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

LINDA CARPENTINO             :    CIVIL NO. 3:01 CV01663(JBA)

         Plaintiff         :

VS                          :

MICHAEL D'AMATO            :
GARY DEPALMA &           :
TOWN OF EAST HAVEN       :    JANUARY 20, 2003

        Deposition of Ms. Nicole Shea, taken pursuant to

Rules 26, 30 and 45 of the Federal Rules of Civil

Procedure, at the offices of Lynch, Traub, Keefe &

Errante, 52 Trumbull Street, New Haven, Connecticut,

before Mr. Robert Geci, a Registered Professional

Court Reporter and Notary Public in and for the State

of Connecticut, at 10:40 a.m. on Monday, January 20, 2003.

2

APPEARANCES:

  REPRESENTING THE PLAINTIFF:  WILLIAMS & PATTIS
               By Katrena Engstrom, Esq.
               51 Elm Street
               New Haven, Ct. 06510


  REPRESENTING THE DEFENDANTS:  LYNCH, TRAUB, KEEFE & ERRANTE
               By Marisa Bellair, Esq.
               52 Trumbull Street
               P.O. Box 1612
               New Haven, Ct.
                    06506-1612

3

# S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel representing the parties that each party reserves the right to make specific objections at the trial of the case to each and every question asked and of the answers given thereto by the deponent, reserving the right to move to strike out where applicable, except as to such objections as are directed to the form of the question.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the respective parties that proof of the official authority of the Notary Public before whom this deposition is taken is waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the parties that all defects, if any, as to the notice of the taking of the deposition are waived.

Filing of the Notice of Deposition with the original transcript is waived.

4

N I C O L E     S H E A,                    1192 North High Street,

          East Haven, Connecticut, having been duly sworn, was

          questioned and testified as follows:

DIRECT EXAMINATION BY MS. BELLAIR:

     Q     Good morning.  My name is Marisa Bellair.  I am an

attorney for Officers DePalma and D'Amato in the present action

that has been brought against them by I presume your Aunt Linda

Carpentino.  Have you ever had your deposition taken before?

     A     No.

     Q     Let me explain to you a little about what is going to

happen.  I will ask you a series of questions which I ask that

you answer truthfully under oath.  If at the time there is a

question you don't understand please let me know and I will be

glad to rephrase the question for you.  Keep in mind that if you

begin to answer a question I'm going to assume you understand it

and we will progress as normal.  I have a tendency to talk fast

so if in the event it becomes hard to understand me, you just

need to let me know.  If you need a break at any time let me know

and we will accommodate you.  So the record is clear, keep in

mind the Court Reporter can't take down shakes or nods of the head.

You have to communicate verbally.  If there is something where

you mean yes or no, please do your best to articulate that, okay?

     A     Okay.

     Q     Before coming here today did you have occasion to review

any documents in preparation for the deposition?

     A     As in those papers.

     Q     Just any documents, if you can tell me what you looked at.

5

A    Just those papers.  I think it was those.

Q    The deposition notice.  What you got.

A    Yes, that is about it.

Q    Did you review anything else?  Did you have occasion
to look at the complaint that is the subject of this matter?

A    Today I believe I looked it over.

Q    What about the police report that was written as a
result of this incident?

A    I didn't see the police report.

Q    Now, other than discussing this particular incident--
withdrawn.  Other than speaking with your attorney before coming
here today, did you talk to anyone else about your deposition
this morning?

A    Just exactly what it was.  Nothing else.

Q    Who did you discuss that with?

A    She explained to me what the deposition was, and so did--

Q    I don't need you to go into the substance of anything
you discussed with your attorney.  Other than your attorney, did
you discuss your deposition testimony here today with anyone else?

A    No.

Q    You didn't discuss it at all with  Stephanie?

A    Oh, no.

Q    What about your Aunt Linda?

A    No.  She just told me what a deposition was.

Q    She didn't talk about the specifics of your deposition
with you?

A    No.

Q   Could you state your full name.

A   Nicole Lynn Shea.

Q   What is your date of birth?

A   11/4/84.

Q   Your current address?

A   1192 North High Street.

Q   That is located in East Haven?

A   Yes.

Q   How long have you lived at this address?

A   Going on eleven years.

Q   Now, who do you live with at this address?

A   Linda and Martin Carpentino.

Q   Linda is your aunt?

A   Yes.

Q   Martin is your uncle?

A   Yes.

Q   How do you refer to Linda?  Do you call her, Aunt Linda?

A   Yes.

Q   Who else do you live with at 1192 North High Street?

A   The children, Martin, Robert, Stephanie and Anthony. And my sister Jennifer.

Q   Were all of these individuals that you just named for me living at the home on September seventh of two thousand?

A   Yes.

Q   Are you currently in school?

A   No, I am not.

Q   Did you graduate from school?

A    Yes.

Q    You graduated from high school, is that correct?

A    Yes.

Q    What high school?

A    East Haven High School.

Q    What year was this?

A    Two thousand two.

Q    Now, on the date in question, on September seventh of two thousand, what year were you in high school?

A    I was a sophomore.

Q    What was your schedule like on that day?  What hours did you attend school?

A    Regular schedule, I believe seven to two.

Q    Where is the high school located?

A    Wheelbarrow Lane.

Q    How far is that approximately from your house if you were to drive in a car?

A    I would say like a mile or so.

Q    How did you normally get back and forth to school?

A    The bus.

Q    On a typical day can you tell me what time you left for school?

A    We would leave for the bus at six forty five.

Q    What about, what time did you return home?

A    Two o'clock, a little like couple minutes after two.

Q    Are you employed presently?

A    Yes.

8

Q     Where do you work?

A     Old Navy in Milford.

Q     What are your hours?

A     Right now I am not on the schedule.  But usually it is like twelve hours a week.

Q     You said you are not currently enrolled in school.  Are you on a break of any kind?

A     I did a semester and now I am taking a break.

Q     Where were you--where did you attend school for that one semester?

A     Gateway Community College.

Q     Do you have any plans to return?

A     Probably going to Galimar in September.

Q     Were you working at the time of the incident, September seventh of two thousand?

A     No, I wasn't.

Q     Do you recall the events of September seventh of two thousand?

A     As in what happened?

Q     Yes.

A     Yes.

Q     Can you tell me what happened?

A     When we got off the bus I walked up the hill.  Our neighbor, I believe, was standing outside and there was a white car in front of the house with paint scraped off basically of the side, and you could tell that it said, police, on it.  And she informed us that there was people in the house; there were cops

9

there.  So we went in and a police officer asked me who I was.
I told him that I lived there.  One officer was walking down the
hallway with a chair and the other was standing at the top of
the stairs.

Q     Now, other than the police car that you observed in
your driveway, did you observe any other cars in the vicinity of
your home?

A     There was a broken down car that was in the front farther
over near the other house.

Q     Was that a car that someone in your family owned?

A     Yes, but it wasn't drivable at the time.

Q     Other than that car did you see any other cars besides
the police car?

A     That I can recall, no.

Q     Do you remember what day of the week this was, September
seventh of two thousand?

A     No, I don't.

Q     Now, on the morning of September seventh of two thousand
what time did you leave your house?

A     Approximately six forty five.

Q     Where were you headed that day?

A     To the bottom of the hill to wait for our bus to come.

Q     Were you on your way to school?

A     Yes.

Q     Was anyone with you?

A     Stephanie.

Q     Is this normal practice, you and Stephanie would walk

to the bus stop and wait for the bus?

    A    Yes.

    Q    Then you would head to school?

    A    Uh-huh.

    Q    Now, a minute ago you told me that when you came home later that day, she informed us that people were inside.  Who are you referring to?  Who is the "she"?

    A    Our neighbor, Dolly.

    Q    So he doesn't have trouble, we both can't try to speak at the same time.  So if you can let me finish my question, and I will do the same, and try not to interrupt you and let you finish your answer before I ask another question.  You said it was your neighbor.  What was her name?

    A    Dolly.

    Q    Do you remember what exactly she said to you?

    A    She just informed us that she had talked to them and that they were in the house, and she told them that there was nobody there.  So I went inside.

    Q    Did she say anything else?

    A    That I can recall, no.

    Q    Did you say anything to her?

    A    No.  I just went inside.

    Q    Now, you said when you went inside the house that day the police officer asked who you were.  Did he say anything else to you?

    A    I just told him who I was and they--as I can recall, nothing else.

Q    Did they explain to you the reason they were inside your home?

A    Not really.  They didn't explain as far as I can remember until once my aunt arrived home.

Q    Now on the morning in question, September seventh of two thousand, was anyone home in the dwelling when you left for school?

A    Just my aunt leaving for work, and my uncle.

Q    Now on a normal day do you know what time she would normally leave for work?

A    If she was on early she would leave at approximately seven.

Q    On this particular day do you know if she was working that early shift?

A    Yes.

Q    To your knowledge do you think she left for work around seven o'clock?

A    Yes.

Q    Now, do you have keys to the house?

A    At the time I didn't.

Q    I'm sorry, withdraw that.  At the time of the incident did you have keys to the house?

A    No.

Q    Was there a reason for that?

A    They just had not made me a key yet.

Q    Were the locks recently changed?

A    No.

12

Q    Why were they making--why were you waiting for someone to make you a key?

A    Because when there is nobody home at the house we usually need a key to get in, and one of us usually has one, but they have to make it.

Q    So was there ever a time that you had keys to the house, ones that you carried on your person?

A    Yes.  They have them now.

Q    But at the time of the incident did you have keys that you carried on your person?

A    No.

Q    What about Stephanie, did she have keys that she carried?

A    I can't tell you for sure, but I am pretty positive usually one of us had a key.

Q    So how were you planning to get back in the house that particular day if you didn't have keys?

A    If the front door was locked?

Q    Yes.

A    Sometimes she would leave the back door unlocked for us to get in.

Q    When you say, sometimes, how often did this occur?

A    Pretty often.  Usually somebody would have the keys, but--

Q    What about the garage, was--did you ever have occasion to use the garage to gain access to the house if the doors were locked?

A    Once or twice.

Q    How did you--did the garage require a key?

A    No, it didn't.

Q    How did you gain access to the house through the garage?

A    By opening it.

Q    Was the garage door broke at the time?

A    I could not tell you for sure.

Q    Did you make any type of arrangements with your aunt prior to leaving the house if neither you or Stephanie had keys how you were going to get back in on September seventh of two thousand?

A    I can't answer that either.  I'm sorry.

Q    You never discussed with your aunt about leaving any of the doors open so that you and Stephanie could get back into the house?

A    Well, usually we would figure that the back door would be unlocked or the garage door if the front door was locked.

Q    Did you ask your aunt on this particular day to leave the back door open?

A    Not that I recall.

Q    What about the garage door?

A    Not that I recall.

Q    What about the front door?

A    Nope.

Q    Now, on the day in question, September seventh, two thousand, what time did you arrive back home?

A    I would say approximately two o'clock.

Q    Were you coming from school?

A    Yes.

Q    How did you get home?

A    The bus.

Q    Was anyone with you at this particular time?

A    Stephanie.

Q    Did you observe anything unusual when you got home?

A    Just the fact that the car was outside.

Q    Anything else?

A    The fact that the paint was scraped off and there was no light on the top of the car.

Q    What about inside the house?

A    Just the fact that they were both in there.  One was coming from down the hallway with a chair.  Couldn't really explain why they were.  And they were questioning me.

Q    What did they ask you?

A    Exactly just who I was, and they didn't really explain to me why they were there.  And then I decided that I needed to call my aunt; that we should call my aunt.

Q    Was that your own decision?  Did anyone ask you to call your aunt?

A    He asked if there was an adult there, and I said, no, and I told him I was going to call my aunt.

Q    What did he say?

A    He said, maybe you should do that.

Q    Are you hot?

A    No.  My eye.

Q    Do you want to take a break to fix it?

A    No.

Q    Okay.  Now, was anyone else present at the house when you got home other than these two officers?

A    Besides myself and Stephanie and the two officers there was nobody else.

Q    How did you enter the house?

A    Through the front door.  It was open.

Q    Now, you said when you walked in you observed one of the officers in the upstairs hallway.  What was he doing?

A    He was walking towards me with the chair that he had taken from our dining room table.

Q    Do you know what he was doing with that chair?

A    I believe he was looking in the attic.

Q    Did he tell you that?

A    When he walked down, no.  He just walked down there with the chair.

Q    What about where was the other officer located at this time when you entered the house?

A    At the top of the stairs.

Q    Was he doing anything?

A    He was just looking at me.

Q    Did he say anything to you?

A    He just asked me who I was.

Q    So it was the one that was just standing there in the hallway that you actually spoke with?

A    No.  It was the one at the top of the stairs that said something to me.

Q    What about the one coming down the hallway with the

chair, did you speak with him at all?

A    I can't recall exactly.

Q    How long would you say you were home before you had occasion to call your aunt?

A    Five minutes, and she came right home.

Q    Where was your aunt when you called her?

A    Working.

Q    Where does she work?

A    I believe Ames at the time.

Q    And approximately what time was it when you called her?

A    Five after two.

Q    Now,--withdrawn.  What did you tell your aunt?

A    On the phone?

Q    Right.

A    That there were two police officers in the house and I didn't exactly understand why they were here.  And I was a little nervous.

Q    Anything else?

A    Just that she should come right home.

Q    What did she say to you?

A    She basically came right home as soon as I talked to her.

Q    How long did it take for her to get home?  Withdrawn. What time did she actually arrive home?

A    I can't tell you the time for sure, but I know that she came home within a couple minutes of me talking to her.

Q    Did the officers at any time identify themselves to you?

A    At first, no, they did not.

Q    When you say, at first, did there ever become a time where they identified themselves to you?

A    As far as I can recall they basically identified themselves once my aunt was there.

Q    When did you in fact learn their names?

A    When they said who they were.  Actually, when I was on the phone with my aunt, that is when they said what their names were.

Q    What did they tell you their names were?

A    I could not tell you for sure because I do not remember.

Q    That's fine.  Now, did you personally observe the officers damage anything in the house?

A    I looked through the house.  Basically they were standing right near me and they kept staying at the back door, and I didn't get a chance to, like, look around exactly.

Q    Did they damage any furnishings in the house to your knowledge?

A    Upstairs, no.

Q    Anywhere else was there damage?

A    Downstairs.

Q    Where specifically?

A    In my cousin's bedroom.

Q    Can you describe for me the damage inside the bedroom?

A    There was his tv was thrown around, I believe.  There was a hole in the wall, and a lot of his electrical appliances you may say, were thrown around.

Q    Now when you say, your cousin's bedroom, whose room is this?

A    Martin.

Q    Is he the only one that occupies this room?

A    That room downstairs. There are two other bedrooms, too.

Q    Whose bedrooms are downstairs besides Martin?

A    My sister Jennifer, and my cousin Anthony.

Q    Is Martin's bedroom locked normally?

A    I can't recall for sure, but a lot of the times as far as I know it usually is locked.

Q    Do you know if it was locked on this particular day, September seven?

A    No.

Q    Now, you testified just a minute ago that you looked through the house. Can you explain to me where in the house you looked for damage?

A    Well, I looked in my room. There was nothing really wrong. And I was just looking around just to see what exactly was going on, and they started talking to me about the back door, and they just put the chair back and that is all I really looked at.

Q    When you say, they started talking to you about the back door, what did they say?

A    They kept insisting about the back door I believe being opened and that was how they got in.

Q    When you say, insisting, what do you mean by that?

A    They kept repeating themselves over and over again.

Q    Did they volunteer this information to you?

A    Yes, because they were at the back door. They were holding the back door.

Q    Did you ever have occasion to ask them how they got in your house?

A    No, but I figured it was because of the front door because the front door was open when we walked in, and then when he was letting me know about the back door it confused me.  It threw me off a little bit.

Q    Did you ask him to clarify your confusion?

A    Not really because I was nervous.

Q    You said you looked in your room.  Did you look in anyone else's room?

A    I just quickly skimmed through.

Q    Did you notice anything unusual?

A    Not as far as I can remember.

Q    Now, you said that in Martin's bedroom in particular you noticed that a tv had been thrown.  Where is the tv normally, or where was it, or where should it have been on this particular day?

A    It is usually on a table, maybe a bureau.  It is usually on like a stand.

Q    Where was the tv when you observed it?

A    It was on the ground.

Q    Was it next to the table?

A    I cannot tell you for sure.

Q    Was it a good distance away from the table?

A    I just recall it being on the floor and not where it usually is.

Q    What about the hole in the wall, where was the hole in the room?